Department of Justice

Washington, D.C. 20530

AUG 11 1980

MEMORANDUM FOR JOHN G. GAINE, ESQ.
General Counsel
Commodity Futures Trading Commission

Re: Expense Reimbursement in Connection with
Chairman Stone's Trip to Indonesia

This reponds to your request of August 6, 1980, for our
opinion on a constitutional question presented in connection
with Commodity Futures Trading Commission (CFTC) Chairman James
M. Stone's proposed trip to Indonesia as a consultant for the
Harvard Institute for International Development of Harvard Uni-
versity (Harvard). You inform us that the trip is to take place
during Chairman Stone's vacation, and the subject of his consul-
tancy, insurance regulation, is unrelated to his official posi-
tion as Chairman of the CFTC. His travel and associated ex-
penses on the trip are to be reimbursed by Harvard from funds
paid under a consultancy contract with the Finance Ministry of
the Government of Indonesia (Indonesia). The question is whether
this arrangement violates Article I, section 9, clause 8 of the
Constitution, the so-called Emoluments Clause. 1/ Based on our
understanding of the terms and conditions of the consultancy,
and of the contract between Harvard and Indonesia, we conclude
that it would not.

---

1/ We emphasize that this opinion addresses only the constitu-
tional issue raised under Article I, section 9, clause 8, and
does not purport to deal with any other statutory or regulatory
restrictions which may be implicated by Chairman Stone's proposed
trip. We note your conclusion, referred to in your letter of
August 6 at Note 1, that Chairman Stone's rendering of advice to
Indonesia on insurance regulation would not constitute a conflict
of interest under the CFTC's Code of Conduct or applicable statu-
tory law.

Article I, section 8, clause 8 provides as follows:

> No Title of Nobility shall be granted
> by the United States: And no Person holding
> any Office of Profit or Trust under them,
> shall, without the Consent of the Congress,
> accept of any present, Emolument, Office or
> Title, of any kind whatever, from any King,
> Prince or foreign State.

The purpose of this provision, as explained in the records of the Constitutional Convention, is "to exclude corruption and foreign influence [by prohibiting] any one in office from receiving or holding any emoluments from foreign states." 3 Farrand, The Records of the Federal Convention of 1787 327 (1966 ed.). See also 2 Farrand 389. Thus, it is "directed against every kind of influence by foreign governments upon officers of the United States," 24 Op. Atty. Gen. 116, 117 (1902), unless it has been expressly consented to by Congress. 40 Op. Atty. Gen. 513 (1947). See 5 U.S.C. § 7342. Ordinarily, reimbursement from a foreign government of a public official's travel expenses would be considered a "present" or "emolument" within the meaning of this constitutional prohibition. 2/ The question in this case, however, is whether the reimbursement is "from" a foreign government at all.

---

2/ See 58 Comp. Gen. 487, 493 (1979)(constitutional prohibition extends to free or reduced transportation, housing allowances, and shipment of household goods at government expense); 49 Comp. Gen. 821 (1970)(prohibition should be given "the broadest possible scope and application"). Congress has consented to reimbursement by a foreign government of travel expenses for travel which is "consistent with the interests of the United States," see 5 U.S.C. § 7342(c)(1)(B)(ii). The legislative history of this provision indicates that the consent given is restricted to reimbursement of expenses to official travel on behalf of the United States, see S. Rep. No. 194, 95th Cong., 1st Sess. 30 (1977), and we are informed by the Legal Adviser's Office in the State Department that the exception has consistently been so construed. You do not suggest -- and, indeed, the facts here would not support the conclusion -- that Chairman Stone's trip should be considered an official one for which reimbursement from a foreign government might be permitted under the statute.

We have found no judicial opinions construing the Emoluments Clause in which the actual source of a "present" or "emolument" was at issue, and no discussion of this issue in any relevant commentary. In the absence of any authoritative guidance on this issue, but with the underlying purpose of the constitutional prohibition in mind, we have relied for our analysis on the terms of the contract between Harvard and Indonesia, and on the circumstances under which the arrangements for the trip were made. While the time constraints indicated in your letter of August 6 have precluded our obtaining a copy of the contract, we have discussed its terms at length with Mr. Richard Pagett, Associate Director of the Harvard Institute for International Development. Mr. Pagett also described to us the manner in which Harvard's invitation was extended to and accepted by Mr. Stone.

As we understand the relevant facts, they are as follows: Harvard has for some years been a party to successive contracts with the Finance Ministry of the Government of Indonesia by which it provides expert consultants to Indonesia in a variety of specified fields relating to trade and finance. Under the most recent contract, effective September 1, 1979, Harvard agrees to conduct certain training programs in Indonesia, and to provide as consultants a number of named individuals, most of them members of the faculty at Harvard or other universities. In addition, other unnamed experts are to be invited from time to time by Harvard to deal with particular problems relating to fiscal policy arising during the period of the contract.

As under its previous contracts with Harvard, Indonesia agrees to pay specified amounts to Harvard in semiannual installments to defray Harvard's costs in administering the program and compensating its experts. At the conclusion of the contract period, some two years hence, an accounting will be made to determine what, if any, additional sums are due Harvard -- or recoverable by Indonesia. In the meantime, Harvard disburses funds in a discretionary manner in fulfilling its obligations to Indonesia under the contract.

Mr. Pagett has informed us that during all of the years in which Harvard has had this contractual consultancy relationship with Indonesia, that government has never sought to influence Harvard's selection of consultants, either before or after an invitation has been extended. The individuals named as consultants in the present contract were chosen unilaterally by Harvard, and agreed to by Indonesia as part of the overall contract. With respect to any additional consultants not named

in the contract, such as Chairman Stone, Harvard has complete discretion in the selection. The contract gives Indonesia no veto power over Harvard's choice; indeed, the present contract does not contain even the clause appearing in its predecessor contracts committing Harvard to give "due consideration" to Indonesia's wishes in this regard.

The terms and conditions of a consultancy are arranged exclusively between Harvard and those it invites to be consultants, and are memorialized in a separate agreement between Harvard and each individual consultant. In Chairman Stone's case, this agreement is represented by Mr. Pagett's letter to him of July 11, 1980, outlining the amount and manner of expense reimbursement. As is the usual case, his expenses are to be reimbursed to him directly by Harvard.

The circumstances of Chairman Stone's invitation from Harvard were also described to us by Mr. Pagett. Sometime in the Spring of this year, the Indonesian Finance Ministry requested assistance from Harvard in dealing with a number of questions which had arisen relating to insurance regulation and investment. Harvard approached several faculty members at its School of Business, who declined an interest in taking on the consultancy themselves, but recommended that Chairman Stone, a former faculty member at Harvard and Massachusetts State Insurance Commissioner, be considered. Other experts in the field of insurance seconded this recommendation. Harvard then contacted Chairman Stone, offering him the consultancy with an honorarium and expense reimbursement. He agreed to accept the invitation and offer of expense reimbursement, but declined the honorarium. His consultancy is to last about two weeks, and was arranged so that it would take place during his vacation. Upon acceptance, Harvard for the first time informed Indonesia that Chairman Stone was the expert it had chosen. 3/

---

3/ According to Mr. Pagett, Chairman Stone may be the first U.S. official to be invited to serve as a consultant in this program. Apparently, under the impression that an official invitation from the Indonesian Government would have to be extended in order to permit his trip, officials at Harvard suggested to the Indonesian Finance Ministry that a letter be sent directly to the United States Government indicating Indonesia's desire to have Chairman Stone's services as a consultant. This letter, addressed to the American Ambassador in Jakarta, requested that

(Footnote cont'd on p. 5)

Assuming the above facts to be accurate, and in the absence of any additional information that would suggest some contrary conclusion, the reimbursement offered Chairman Stone for his travel expenses in connection with the Harvard consultancy cannot be said to be "from" a foreign government within the meaning of Article I, section 9, clause 8. His acceptance of reimbursement would not therefore implicate that provision.

We might note that we have discussed the arrangements for Chairman Stone's proposed trip with the Legal Adviser's Office at the State Department. That Office informs us that in analogous situations involving reimbursement for unofficial foreign travel by U.S. officials a key consideration in determining its propriety has been the degree of control which the foreign government retains over the selection and payment of individual participants. Since, as appears to be the case here, the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.

Sincerely,


Leon Ulman
Deputy Assistant Attorney General
Office of Legal Counsel

------

3/ (Footnote cont'd from p. 4)

Chairman Stone be "released" to perform the consultancy, and promised the payment of air fare and per diem expense "by the Government of Indonesia." This latter conclusory characterization of the source of Chairman Stone's reimbursement must be measured against the strong countervailing evidence that control of the funds for reimbursement is entirely in Harvard's hands, and that payment will in fact be made from Harvard directly to Chairman Stone.